UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ANAND CHAVAKULA,

    Plaintiff,

v.

CHRISTIAN HERITAGE
BROADCASTING, INC.,

    Defendant.

Civil Action No. TDC-21-3295

**MEMORANDUM OPINION**

Plaintiff Anand Chavakula, a Christian minister who asserts ownership of the "PRAISELIVE" trademark, has filed a civil action against Defendant Christian Heritage Broadcasting, Inc. ("Christian Heritage") in which he alleges trademark infringement, unfair competition, and other claims under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), 1125(c) (2018), as well as state law claims for trademark infringement and unfair competition. Pending before the Court is Christian Heritage's Motion to Dismiss for Lack of Personal Jurisdiction, or Alternatively to Transfer Venue, which Chavakula opposes. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Christian Heritage's Motion will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

According to the currently operative Amended Complaint, Chavakula is a Christian minister who owns the U.S. trademark "PRAISELIVE," which he uses in connection with his business of creating, distributing, advertising, and making available for download religious music,

videos, and other resources. Chavakula, who resides in Hyattsville, Maryland, conducts this activity primarily through his website, praiselive.com, which he started in 2009. Chavakula promotes his website through social media, at churches and in-person events, and by word of mouth.

Christian Heritage is a corporation organized under the laws of Minnesota with its principal place of business in Osakis, Minnesota. It operates a Christian radio ministry that offers live religious radio content via FM airwave broadcast on five radio stations in Minnesota, South Dakota, and Montana. It also broadcasts via FM radio stations in Africa that reach listeners in Ghana, Uganda, Guinea-Bissau, Sierra Leone, Malawi, Togo, Liberia, Namibia, Benin, and Mozambique. Christian Heritage also offers satellite radio broadcasts accessible in Africa and the Middle East. In addition, it offers Internet radio stations available through its website, praiselive.org, and various mobile applications, including a "Local" channel directed to listeners in Minnesota, North Dakota, and South Dakota; an "Africa" channel focused on listeners in Africa; and a "Global" channel directed to the world at large. McIver Decl. ¶ 10, ECF No. 31-2.

Christian Heritage uses the "praiselive.org" website as its primary internet presence and branding vehicle and also has produced a mobile phone application under the name "PraiseLive." Opp'n Mot. Dismiss Ex. O, ECF No. 32-1. Christian Heritage accepts donations through its website. Despite its presence on the airwaves abroad, over 90 percent of Christian Heritage's donations come from listeners in Minnesota, North Dakota, South Dakota, and Wisconsin.

On February 7, 2018, Christian Heritage, through a related entity, Praise Broadcasting, filed an application with the United States Patent and Trademark Office ("USPTO") to register the trademark "PRAISELIVE," which the USPTO granted on July 31, 2018. Compl. Ex. E, ECF No. 1-6. On May 21, 2019, Chavakula filed an application with the USPTO to register the trademark

2

Case 8:21-cv-03295-TDC   Document 34   Filed 02/28/23   Page 3 of 11

"PRAISELIVE" which has not been granted. Am. Compl. Ex. B, ECF No. 27-1. On September 21, 2020, Chavakula filed a trademark registration application with the USPTO for the mark "PRAISELIVE" as used with a particular logo, which was granted on April 20, 2021. Am Compl. Ex. A, ECF No. 27-1.

In the Amended Complaint, Chavakula asserts that he "acquired protectable exclusive rights in his PRAISELIVE Mark in 2009," and that Christian Heritage's first usage of the contested mark began in April 2017. He therefore asserts that Christian Heritage knowingly and intentionally misled the USPTO when it declared in its application for registration that it was entitled to the use of the "PRAISELIVE" mark to the exclusion of all others. Am. Compl. ¶ 27. He also alleges that Christian Heritage has used search engine optimization tactics to promote its "PraiseLive" brand to the detriment of his PRAISELIVE mark. *Id.* ¶ 37. Chavakula contends that Christian Heritage's use of the PRAISELIVE mark and its search optimization tactics have caused confusion among Maryland residents between his products and Christian Heritage's products.

## DISCUSSION

In its Motion, Christian Heritage seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) on the grounds that its contacts with Maryland are insufficient to allow this Court to exercise personal jurisdiction over it, and pursuant to Rule 12(b)(3) based on improper venue. Alternatively, it seeks a transfer of this action to the United States District Court for the District of Minnesota.

### I. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may seek dismissal for lack of personal jurisdiction. It is the plaintiff's burden to establish personal jurisdiction. *See Mylan Labs. Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). To carry that burden at the pleading

stage, the plaintiff need only make a *prima facie* showing that a defendant is properly subject to this Court's jurisdiction. *Id.* In evaluating the plaintiff's showing, this Court must accept the plaintiff's allegations as true, and it must draw all reasonable inferences and resolve any factual conflicts in the plaintiff's favor. *Id.* The Court may consider evidence outside the pleadings in resolving a Rule 12(b)(2) motion. *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d. 757, 763-64 (D. Md. 2009).

A district court's exercise of personal jurisdiction over a non-resident defendant must satisfy both the long-arm statute of the state in which the court sits and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). As relevant here, the Maryland long-arm statute authorizes jurisdiction over a party which:

> [c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State.

Md. Code Ann., Cts. & Jud. Proceedings § 6-103(b)(4) (West 2022). Because courts have interpreted the Maryland long-arm statute to reach as far as the Constitution allows, the statutory and due process components of the personal jurisdiction analysis merge. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).

Courts distinguish between two types of personal jurisdiction: general and specific. General jurisdiction offers a path to personal jurisdiction when the suit brings "causes of action arising from dealings entirely distinct from" the defendant's contacts with the forum. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)). Specific jurisdiction provides authority "over a defendant in a suit arising out of or related

4

to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

## II. General Jurisdiction

In his memorandum in opposition to the Motion, Chavakula offers no specific argument as to whether there is general jurisdiction over Christian Heritage. General jurisdiction exists where a defendant is "essentially at home" in the forum State. *Daimler AG*, 571 U.S. at 127. A corporation is "at home" in those states where its contacts are "continuous and systemic" so as to give rise to jurisdiction over any claims against the corporation in the state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). "The paradigm forums in which a corporate defendant is at home . . . are the corporation's place of incorporation and its principal place of business." *BNSF R. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017). Here, where it is undisputed that Christian Heritage is incorporated in and has its principal place of business in Minnesota, the Court lacks general jurisdiction over Christian Heritage.

## III. Specific Jurisdiction

Specific jurisdiction exists where a defendant has established "minimum contacts" with the forum state that "have not only been continuous and systematic, but also give rise to the liabilities sued on." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-17 (1945). The defendant's conduct and connection with the forum state must be sufficient that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1979). The inquiry focuses on the defendant's particularized intent to enter the forum, specifically whether the defendant has engaged in "purposeful availment" of the privileges of conducting activities in the forum state, such that "a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party

5

or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). Specifically, a determination of whether specific jurisdiction exists requires a three-part inquiry into (1) whether the defendant purposefully availed itself of the privileges of conducting activities in the forum state; (2) whether the plaintiff's claim arises out of the defendant's forum-related activities; and (3) whether the exercise of personal jurisdiction over the defendant would be constitutionally reasonable. *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002).

When a commercial entity does not have a physical presence in the forum state, it must have "purposely directed" efforts toward residents of that state in order to be subject to personal jurisdiction in that state. *Burger King*, 471 U.S. at 476. In this case, there is no dispute that Christian Heritage has had no physical presence in Maryland. There is also no dispute that Christian Heritage's FM radio broadcasts do not reach Maryland. Thus, to the extent that Christian Heritage has purposely directed activities toward Maryland residents, it must be based on Christian Heritage's internet activities. Chavakula argues that personal jurisdiction exits because Christian Heritage has used its "total online presence," including its active website, social medial accounts, internet radio content, and smartphone apps, to "intentionally interact[] with users from all over the world, including Marylanders." Opp'n Mot. Dismiss at 12, ECF No. 32. Chavakula asserts that these internet activities include encouraging users to take affirmative actions in response to its content, including selecting the option to listen to internet radio content, attending virtual events, submitting prayer requests, and making donations. He further argues that personal jurisdiction is proper in Maryland in part because these internet activities harm, confuse, and exploit Maryland residents in light of Christian Heritage's alleged infringing activity.

In *ALS Scan, Inc. v. Digital Service Consultants*, 293 F.3d 707 (4th Cir. 2002), the United States Court of Appeals for the Fourth Circuit adopted a specific test for determining whether

personal jurisdiction exists based on internet-based activities under which personal jurisdiction exists over an out-of-state defendant if that defendant (1) "directs electronic activity" into the forum State; (2) "with the manifested intent of engaging in business or other interactions within the State"; and (3) "that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *Id.* at 714. Under this test, which derives from a framework first adopted in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), the court must consider the nature and quality of the activity conducted over the internet. *ALS Scan*, 293 F.3d at 713. Where a website is used to conduct business over the internet and to enter into contracts with internet users from the forum state involving the knowing and repeated transmission of information over the internet, it is an active website and personal jurisdiction is proper. *Id.* (citing *Zippo*, 952 F. Supp. at 1124). Where a website merely posts information for users to view but does not otherwise interact with users in the forum state, it is a "passive" website and personal jurisdiction is not proper. *Id.* at 713-14 (quoting *Zippo*, 952 F. Supp. at 1124). Where users can exchange some information with the website, personal jurisdiction is determined by "examining the level of interactivity and commercial nature of the exchange of information that occurs" on the website. *Id.* (quoting *Zippo*, 952 F. Supp. at 1124). When the website occupies this middle ground of a "semi-interactive" website, the defendant must "have acted with manifest intent of targeting Marylanders" in order to establish personal jurisdiction in Maryland. *Carefirst*, 334 F.3d at 400.

In *Carefirst*, the Fourth Circuit applied this framework to a case in which Carefirst of Maryland, Inc., a Maryland health insurance company, brought suit against Carefirst Pregnancy Centers, Inc. ("CPC"), an Illinois crisis pregnancy center, for trademark infringement based upon its internet domain name. *Id.* at 393. The court found that CPC's websites, which provided CPC's

7

only arguable contacts with Maryland residents, were "semi-interactive" because they "contain[ed] features that ma[de] it possible for a user to exchange information with the host computer," including by providing a means by which a user could make a financial donation to CPC. *Id.* at 394, 400. In analyzing whether the defendant acted with manifest intent to direct its activity to Maryland, the court found that where the defendant provided services to Chicago-area residents specifically and its websites thus had a "strongly local character," the defendant's generalized request on its website for "anyone, anywhere" to make a donation was "an insufficient Maryland contact to sustain jurisdiction," particularly where there had been only one such online donation by a Marylander, which appeared to be initiated by the plaintiff to bolster its litigation position. *Id.* at 401. Finding that CPC's semi-interactive website did not "direct electronic activity into Maryland with the manifest intent of engaging in business or other interactions within that state in particular," the court affirmed the dismissal of the case for lack of personal jurisdiction. *Id.*

As in *Carefirst*, Christian Heritage's internet activity occupies the middle ground identified in *ALS Scan* and *Zippo*. As Chavakula acknowledges, there is no means by which to engage in commercial transactions on Christian Heritage's website. The ability to make charitable donations does not render the website fully interactive within the meaning of *ALS Scan* and *Zippo*. *See Carefirst*, 334 F.3d at 401. The remaining level of interactivity is low: although users can submit "praise" and "prayer" requests through the website, there is nothing to suggest that this process entails an exchange of information similar to the transmission of files and formation of contracts contemplated for "active" websites in *Zippo*. *ALS Scan*, 293 F.3d at 713-14; *Zippo*, 952 F. Supp. at 1124. Thus, Christian Heritage's internet activity can support personal jurisdiction only if there was a manifest intent to engage in business or other interactions with residents of Maryland. *See ALS Scan*, 293 F.3d at 714.

No such manifest intent is present here. None of the materials presented to the Court demonstrate that Christian Heritage has specifically targeted Marylanders through its internet activities. Christian Heritage's slogan that it helps "every tribe and nation" does not target Maryland any more than the residents of any other state or nation. Opp'n Mot. Dismiss Ex. C-3, ECF No. 32-1. Likewise, its statement on social media that it "ministers to people listening from nearly every nation on earth" could not reasonably be construed as targeting Marylanders. Opp'n Mot. Dismiss Ex. H-1, ECF No. 32-1. Although Christian Heritage expressly targets its "Local" internet radio broadcasts to residents of Minnesota, North Dakota, and South Dakota and its "Africa" radio broadcast to residents of that continent, it does not direct these broadcasts or any other radio content to residents of Maryland. The internet radio station entitled "Global" does not direct content to Marylanders any more than to residents of any other state or nation.

Chavakula has submitted screenshots of social media activity in which purported Maryland residents interacted with Christian Heritage content through Facebook comments. Even assuming the accuracy of the unverified social media communications presented in such exhibits, the Court finds that the fact that a few Maryland residents commented on a Facebook post by Christian Heritage cannot establish that the defendant "direct[ed] electronic activity into Maryland with the manifest intent" of engaging in interactions with Maryland residents. *Carefirst*, 334 F.3d at 401. Similarly, the fact that Chavakula was able to download Christian Heritage's "PraiseLive" mobile app while in Maryland does not constitute a contact sufficient to establish jurisdiction.

Finally, Chavakula has submitted affidavits purporting to show that Maryland residents have made donations to Christian Heritage out of a mistaken belief that Defendant's praiselive.org website was in fact Chavakula's praiselive.com website. The record shows that, other than Chavakula's own donation to Christian Heritage, only three donations have been made by

9

Maryland residents since 2015 to Christian Heritage through the praiselive.org website. Of these donations, only one was made prior to the commencement of this litigation, and that donation was made before Christian Heritage began using the "PraiseLive" mark. As in *Carefirst*, this sparse donation history in response to a general solicitation for donations on the Christian Heritage website does not demonstrate the manifest intent necessary to establish personal jurisdiction based on its internet activities. *See Carefirst*, 334 F.3d at 395. Rather, these contacts are best characterized as random and fortuitous, rather than continuous and systematic. *See Burger King*, 471 U.S. at 475. Christian Heritage's semi-interactive website, which identifies its target markets as areas other than the state of Maryland, solicits interactions and donations without regard to geographic location, and has received exceedingly few donations from Maryland, does not create sufficient contacts with Maryland to establish personal jurisdiction consistent with the requirements of the Due Process Clause. The Court therefore finds that this case is subject to dismissal for lack of personal jurisdiction.

## IV. Transfer

Because the Court lacks personal jurisdiction over Christian Heritage, the case may not proceed further in the District of Maryland, and it need not address Christian Heritage's alternative arguments for dismissal or for a transfer of venue. Before dismissing this case, however, the Court may instead transfer the case to another district in which personal jurisdiction exists and venue is proper if such a transfer is in the interests of justice. *See* 28 U.S.C. §§ 1404, 1406; *cf. Leroy v. Great Western United Corp.*, 443 U.S. 173, 181 (1978) (noting that a court may as a prudential matter address venue before personal jurisdiction). Christian Heritage acknowledges that it is subject to personal jurisdiction, and venue is proper, in the District of Minnesota. In light of the passage of time since the filing of the Complaint and the Motion, the Court finds that a transfer, if

requested by Chavakula, is in the interests of justice. Accordingly, upon request of Chavakula, the Court will transfer this case to the United States District Court for the District of Minnesota. *See* 28 U.S.C. § 1404(a). To the extent that Chavakula seeks such transfer, he must file a notice stating that he requests such a transfer within **seven days** of the entry of the accompanying Order. If he does not request such a transfer or files no timely notice, the Court will dismiss this case pursuant to Rule 12(b)(2).

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss for Lack of Personal Jurisdiction will be GRANTED IN PART. The Motion will be granted in that the Court finds a lack of personal jurisdiction. Upon the request of the plaintiff filed within seven days, the Court will transfer this to the United States District Court for the District of Minnesota; in the absence of such a request, the case will be dismissed. A separate Order shall issue.

Date: February 28, 2023

THEODORE D. CHUANG
United States District Judge